IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Willie Charles Alexander, Jr.,<br><br>Plaintiff,<br><br>v.<br><br>FedEx Freight, Inc.,<br><br>Defendant. | C/A No.: 3:24-cv-6608-SAL-TER<br><br>**ORDER** |

Plaintiff Willie Charles Alexander, Jr. ("Alexander") sues his former employer, FedEx Freight, Inc. ("FedEx"), for discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e-17. This case was referred to United States Magistrate Judge Thomas E. Rogers, III for all pretrial proceedings pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Civ. Rule 73.02(B)(2)(g) (D.S.C.). On June 11, 2026, Magistrate Judge Rogers issued a Report and Recommendation (the "Report"), recommending that the court grant summary judgment to FedEx. [ECF No. 56.] Alexander objects to the Report. [ECF No. 60.] For the reasons explained below, the court overrules Alexander's objections, adopts the Report in full, and grants FedEx's motion for summary judgment, ECF No. 34.

## I. BACKGROUND

Alexander, a Black man, began working for FedEx in 2002 as a part-time dock worker. [ECF No. 34-1 at 6.][1] In 2010, he entered FedEx's driver apprentice program. *Id.* at 13–15. Upon completing the program, he began working as a city driver based out of the Columbia Service Center. *Id.* at 18. His supervisor was Andrew Fleig ("Fleig"), a White man. *Id.* at 18–19. According

[1] References to page numbers are to those generated by CM/ECF.

to Fleig, Alexander was "one of the better drivers" at the Columbia Service Center, was "knowledgeable," and "did great with his customers." [ECF No. 34-6 at 8.] Fleig once named Alexander Driver of the Month and awarded him the Purple Promise Award in 2020—the only such award Fleig gave out in over a decade. [ECF Nos. 34-1 at 20; 34-6 at 10.]

During his time with FedEx, Alexander was subject to a corrective action policy (the "Policy"). [ECF No. 34-5.] Under the Policy, "[f]or all but the most serious offenses," FedEx follows a process of progressive discipline, which is intended to give employees "the opportunity to learn from their mistakes" and to ensure they understand "work rules, policies, and job expectations." *Id.* at 2. The Policy sets out a four-step progression: a first violation results in "Verbal Coaching"; a second offense results in "Written Corrective Action"; a third or subsequent offense results in "Critical Written Corrective Action," which may include suspension; and further occurrences may lead to termination. *Id.* Progression through these steps is not mandatory, however. The Policy permits steps to "be skipped at the discretion of management depending on the severity of the issue." *Id.* It further provides that termination "may result" either when "an employee has failed to follow previous corrective action" or when "a specific offense is so serious in nature that management determines termination is warranted." *Id.*

The events giving rise to Alexander's termination occurred in June and July of 2023. On June 8, Alexander mistakenly attached his truck to the wrong trailer. [ECF No. 34-1 at 24.] The trailer was in "active loading status," meaning that a dock worker was inside it on a forklift loading freight. [ECF No. 34-7 at 2, 4.] As the worker was driving the forklift out of the trailer, Alexander pulled the trailer away from the dock, pinning the forklift between the trailer and the dock. *Id.* at 4, 6. FedEx issued a Critical Written Corrective Action to Alexander for this incident and suspended him for three days. [ECF Nos. 34-1 at 25; 34-8 at 2.] Alexander admitted he committed

a safety violation and did not appeal his suspension because he "wanted to move past it." [ECF No. 34-1 at 26, 31.]

The following month, on July 3, Alexander backed into a yellow metal pole at the Columbia Service Center while operating a forklift. [ECF Nos. 34-6 at 7; 34-9 at 2.] He did not report the incident, and management did not notice the damage until after the Fourth of July holiday, when they observed that the forklift was "covered with scrapes." [ECF Nos. 34-6 at 7; 34-9 at 2.] After reviewing security footage, they determined that Alexander was responsible. [ECF No. 34-9 at 2.] Fleig met with Alexander about the incident on July 7. *Id.* As it turns out, Alexander had struck another pole earlier that day before their meeting, but he failed to mention it to Fleig. *Id.* Management noticed damage to the second pole the following week, and security footage again showed that Alexander was responsible. *Id.*

FedEx's forklift safety guidelines ("Forklift Guidelines") require that "[a]ll forklift incidents resulting in damage or possible injury must be reported immediately by the operator. Failure to do so will be considered 'Failure to report,' resulting in corrective action." [ECF No. 34-4 at 7.] So, on July 18, Fleig recommended that FedEx terminate Alexander "[d]ue to [his] failure to report the accidents." [ECF No. 34-9 at 4.] The next day, July 19, an HR representative interviewed Alexander. *Id.* at 5. Alexander explained that the poles were new, that he "misjudged how close [he] was to the pole" on July 3, and that he was working in close proximity to another employee when he struck the pole on July 7. *Id.* When asked why he did not report either incident, Alexander responded that he "was thinking to get the stuff loaded on both days" and "didn't intentionally try [to] tear up anything." *Id.*

On July 24, 2023, FedEx terminated Alexander's employment. [ECF No. 34-10.] Alexander appealed his termination through FedEx's internal appeal process, asserting that he

"honestly didn't think that [he] had bumped the pole" and "would have reported it immediately" had he known. [ECF No. 42-3 at 3.] FedEx denied his appeal and upheld his termination on August 3, 2023. [ECF No. 34-11 at 4.]

On October 15, 2024, Alexander filed this lawsuit in South Carolina state court. [ECF No. 1-1.] In Count One, he alleges that FedEx "wrongfully suspended and terminated [him] because of his race." *Id.* ¶ 21. In Count Two, he alleges that FedEx retaliated against him for opposing his three-day suspension as racially motivated. *Id.* ¶ 25. FedEx removed the case to federal court and, after discovery, moved for summary judgment. [ECF No. 34.] On June 11, 2026, Magistrate Judge Rogers issued the Report recommending that the court grant summary judgment in favor of FedEx. [ECF No. 56.] Magistrate Judge Rogers first concluded that Alexander's race discrimination claim failed because he had not identified a similarly situated comparator or any other evidence that could give rise to an inference of unlawful discrimination. *Id.* at 12–16. Magistrate Judge Rogers then recommended granting summary judgment on Alexander's retaliation claim because he failed to point to any evidence in the record showing that he engaged in protected activity.[2] *Id.* at 17. Alexander filed objections to the Report, to which FedEx has replied. [ECF Nos. 60, 61.]

## II. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[2] Alexander's response brief cites pages 40 and 41 of Fleig's deposition for the proposition that Alexander "objected to the severity" of his suspension and complained that "white drivers who committed similar errors were not disciplined as harshly." [ECF No. 42 at 3.] Yet those pages say nothing of the sort; they concern Fleig's account of another HR investigation and his interactions with FedEx's in-house counsel. [ECF No. 42-1 at 30–31.] Unfortunately, this is not an isolated occurrence. Alexander's response brief contains numerous factual assertions that either lack a citation to the record or are not supported by the evidence cited.

56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might affect the outcome of the suit under the governing law." *Milla v. Brown*, 109 F.4th 222, 228 (4th Cir. 2024) (internal quotation marks omitted). In ruling on a motion for summary judgment, the court views "all facts and reasonable inferences in the light most favorable to the nonmoving party." *Ballengee v. CBS Broad., Inc.*, 968 F.3d 344, 349 (4th Cir. 2020).

The moving party bears the "initial responsibility of informing the district court of the basis for its motion[] and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party does so, the burden shifts to the nonmoving party to "go beyond the pleadings" and come forward with "specific facts showing that there is a genuine issue for trial." *Id.* at 324. To withstand summary judgment, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

### B. Review of a Report and Recommendation

A report and recommendation carries no "presumptive weight," and the responsibility for making a final determination remains with the court. *Mathews v. Weber*, 423 U.S. 261, 271 (1976). The court reviews de novo "those portions of the report . . . to which objection is made" and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge" or "recommit the matter . . . with instructions." 28 U.S.C. § 636(b)(1). "To trigger de novo review, an objecting party 'must object to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection.'" *Elijah v. Dunbar*, 66 F.4th 454, 460 (4th Cir. 2023) (quoting *United States v. Midgette*,

478 F.3d 616, 622 (4th Cir. 2007)). In the absence of specific objections, the court reviews only for clear error, *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005), and need not give any explanation for adopting the report, *Camby v. Davis*, 718 F.2d 198, 200 (4th Cir. 1983).

## III. DISCUSSION

The court begins with the legal framework governing Alexander's discrimination and retaliation claims. Title VII makes it unlawful "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). Title VII separately prohibits retaliating against an employee "because he has opposed any practice made . . . unlawful . . . by [the statute], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the statute]." *Id.* § 2000e-3(a). When, as here, a plaintiff lacks direct evidence of discrimination or retaliation, he may prove his claim through the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Johnson v. Balt. City*, 163 F.4th 808, 814, 819 (4th Cir. 2026).

To prevail under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination or retaliation. A plaintiff establishes a prima facie case of discrimination by showing: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). "A prima facie case of retaliation requires proof that: (1) the plaintiff engaged in protected activity, (2) [he] suffered an adverse employment action, and (3) there was a causal connection between the

protected activity and the adverse action." *Ray v. Int'l Paper Co.*, 909 F.3d 661, 669 (4th Cir. 2018).

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory or nonretaliatory reason for the challenged action. *Lashley v. Spartanburg Methodist Coll.*, 66 F.4th 168, 174 (4th Cir. 2023); *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019). "This burden is one of production, not persuasion[,]" and "involve[s] no credibility assessment." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000) (internal quotation marks omitted). The employer need only produce "admissible evidence . . . which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Cntr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal quotation marks and emphasis omitted).

At the final stage, "the *McDonnell Douglas* framework—with its presumptions and burdens—disappear[s]." *Reeves*, 530 U.S. at 142–43 (internal quotation marks omitted). The plaintiff must come forward with sufficient evidence to create a genuine dispute as to whether "the legitimate reasons offered by the defendant were . . . a pretext for discrimination [or retaliation]." *Id.* at 143 (internal quotation marks omitted); *see also Roe v. Marshall Univ. Bd. of Govs.*, 145 F.4th 561, 569 (4th Cir. 2025). A plaintiff can demonstrate pretext either by showing that the defendant's explanation is "unworthy of credence" or by "adducing other forms of circumstantial evidence sufficiently probative of discrimination [or retaliation]." *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 257 (4th Cir. 2025) (internal quotation marks omitted).

With these principles in mind, the court turns to the merits of Alexander's arguments and his objections to the Report.

**A. Alexander Cannot Establish a Prima Facie Case of Discrimination**

The magistrate judge recommended granting summary judgment on Alexander's race discrimination claim in part because he had not shown that he was treated any less favorably than a similarly situated employee outside of his protected class. [ECF No. 56 at 14.] Alexander objects to this recommendation, claiming that he has identified two White road drivers—Benjamin Bradstreet and Chuck Corbett—who he says committed similar offenses yet were disciplined less harshly than he was. [ECF No. 60 at 6–10.]

A plaintiff can establish the fourth element of a prima facie case of discrimination by showing that "similarly-situated [comparators] outside the protected class received more favorable treatment." *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004). Comparators are similarly situated if they "dealt with the same supervisor, were subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Cosby v. S.C. Prob., Parole & Pardon Servs.*, 93 F.4th 707, 714 (4th Cir. 2024) (brackets and internal quotation marks omitted). The Fourth Circuit has recognized that a comparison between similar employees "will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances." *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993). Even so, "[t]he similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful." *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008); *see also Tinsley v. City of Charlotte*, 854 F. App'x 495, 501 (4th Cir. 2021) (unpublished but orally argued) ("[T]he misconduct of the proposed comparator must be similar enough to that committed by the plaintiff to ensure that courts do not

'confus[e] apples with oranges' . . . ." (quoting *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001))).

Here, neither of Alexander's proposed comparators is sufficiently similarly situated to support an inference of unlawful discrimination. A review of Corbett's personnel file reveals three safety-related incidents: (1) a May 2021 incident in which he failed to disconnect air lines from a dolly; (2) a June 2022 incident in which he suffered a tire blowout while on I-20; and (3) a September 2022 incident in which chain link fencing fell from the trailer of a passing vehicle and struck his driver-side mirror. [ECF No. 42-6 at 4, 12, 18.] Importantly, however, nothing in the record indicates that Corbett failed to report any of these incidents. Therefore, because Corbett did not "engage[] in the same conduct as [Alexander], [he] cannot serve as [a] valid comparator[]." *Cosby*, 93 F.4th at 714–15 (internal quotation marks omitted).

Alexander's reliance on Bradstreet as a comparator also falls short. The record shows that Bradstreet was involved in five safety-related incidents between February 2019 and June 2023, including a "high hook" accident that he failed to report and for which he received a Critical Written Corrective Action.[3] [ECF No. 42-5 at 6, 17, 23, 24, 30.] Alexander emphasizes that Bradstreet was not suspended or terminated for this offense, though he was fired for committing the same type of violation. But Alexander fails to account for a key "differentiating . . . circumstance[]" that distinguishes Bradstreet's conduct from his. *Cosby*, 93 F.4th at 714 (internal quotation marks omitted). When Bradstreet committed his failure-to-report violation, FedEx had not previously taken any corrective action against him. [ECF No. 42-5 at 6.] Alexander, by contrast, had already been issued a Critical Written Corrective Action with a three-day suspension

[3] Alexander claims that Bradstreet also failed to report another incident occurring in March 2019, ECF No. 42 at 6, but that assertion is not supported by the record.

just a month before his termination. [ECF No. 34-8 at 2.] And FedEx explicitly warned him that future infractions could lead to additional corrective action, "up to and including termination." *Id.* Given this material difference in disciplinary history, Bradstreet is not similarly situated to Alexander "in all *relevant* respects." *Johnson*, 163 F.4th at 818 (emphasis in original) (internal quotation marks omitted); *see Tinsley*, 854 F. App'x at 502 ("Without a similar disciplinary history, [the proposed comparator] cannot be considered similarly situated." (quoting *Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854, 860 (7th Cir. 2008))); *Irani v. Palmetto Health*, 767 F. App'x 399, 420–21 (4th Cir. 2019) (unpublished but orally argued) (holding that a plaintiff medical resident who had been placed on a remediation plan for prior patient care issues was not similarly situated to residents without one).

Alexander also insists that Bradstreet was treated more favorably since he had been involved in several other preventable accidents yet was never suspended or terminated.[4] [ECF No. 42 at 15; ECF No. 60 at 8.] While it is true that Bradstreet was not suspended or terminated for those accidents, none was "comparable in seriousness" to Alexander's June 2023 pull-away accident. *Cook*, 988 F.2d at 511 (requiring a plaintiff to prove "that the prohibited conduct in which he engaged was comparable in seriousness to the misconduct of employees outside the protected class"). Bradstreet's accidents all involved only equipment or property damage. Alexander, on the other hand, endangered a coworker's safety by pulling a trailer away from the dock while the

[4] In addition to the "high hook" incident, Bradstreet's personnel file reflects four other incidents: (1) a March 18, 2019, incident in which he failed to disconnect air lines before pulling away from a trailer; (2) a March 19, 2019, incident in which a dolly came unhooked from his truck and struck another trailer in the yard; (3) a November 10, 2022, incident in which he backed into a parked trailer; and (4) a June 15, 2023, incident in which he took a turn too sharply and struck a stationary hostler truck. [ECF No. 42-5 at 17, 23, 24, 30.] FedEx determined that the March 18, 2019, November 10, 2022, and June 15, 2023, incidents were "preventable" and required Bradstreet to complete corrective training. *Id.* at 20, 29, 36.

coworker was inside the trailer operating a forklift. Moreover, Alexander overlooks that his own record includes accidents comparable to those involving Bradstreet for which he, too, was never disciplined. In September 2016, for example, Alexander damaged the fifth wheel of his truck while backing up to a trailer at an angle. [ECF No. 42-9 at 11–12.] And in October 2020, he failed to report that he had damaged a wheel lock mechanism at a customer's receiving dock. *Id.* at 33. His personnel file, however, does not indicate that he was reprimanded for either incident. That Alexander himself went undisciplined for conduct comparable to Bradstreet's further undermines any suggestion that he was treated less favorably. *See Dawson v. Wash. Gas Light Co.*, No. 19-2127, 2021 WL 2935326, at *1, *6 (4th Cir. July 13, 2021) (unpublished but orally argued) (holding that a White coworker who "evaded discipline for tardiness" was not a valid comparator where the plaintiff "concede[d] that he himself evaded discipline and instead received counseling from [his supervisor] about his tardiness the first time he was late" (emphasis omitted)).

In short, Alexander fails to raise a genuine dispute of material fact on whether FedEx treated similarly situated employees outside his protected class more favorably. The magistrate judge thus correctly determined that Alexander cannot establish a prima facie case of race discrimination.[5]

---

[5] In his objections, Alexander contends that summary judgment is inappropriate because a factual dispute remains as to whether he was aware that he had hit the poles on July 3 and July 7. [ECF No. 60 at 3–5.] Alexander is incorrect. The relevant question is not whether he actually knew he had struck the poles, but whether FedEx honestly believed he had. *See Gibson v. Fluor Daniel Servs. Corp.*, 281 F. App'x 177, 179 (4th Cir. 2008) (unpublished but orally argued) ("[A]n employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct." (internal quotation marks omitted)); *see also DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) ("[W]hen an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether the reason was wise, fair, *or even correct*, ultimately, so long as it truly was the reason for the plaintiff's termination." (emphasis added) (internal quotation marks omitted)).

Here, FedEx management determined that Alexander was responsible for striking the poles after reviewing security footage, and Alexander presents no evidence that FedEx "did not truly

**B. Alexander Fails to Create a Genuine Dispute of Material Fact Under a Mixed-Motive Theory of Discrimination**

Alexander next faults the magistrate judge for failing to address his mixed-motive theory of liability. [ECF No. 60 at 16.] Although the magistrate judge analyzed Alexander's discrimination claim solely under the *McDonnell Douglas* framework, Alexander has nevertheless failed to raise a triable issue on whether race was a motivating factor in his termination.

In addition to the "traditional but-for causation standard" provided for in 42 U.S.C. § 2000e-2(a)(1), *Bostock v. Clayton Cnty.*, 590 U.S. 644, 657 (2020), Title VII permits recovery when a protected trait was "a motivating factor" in the challenged employment action, 42 U.S.C. § 2000e-2(m). "In other words, a plaintiff may establish a Title VII violation by proving that an employer took an employment action *in part* because of an unlawful motive." *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 323 (2025) (emphasis in original) (Thomas, J., concurring).

To advance his mixed-motive theory, Alexander principally relies on his alleged comparator evidence regarding Bradstreet and Corbett. [ECF No. 60 at 16.] But as explained above, Bradstreet and Corbett were not similarly situated to Alexander "in all relevant respects." *Johnson*, 163 F.4th at 818 (emphasis omitted) (internal quotation marks omitted). Thus, FedEx's treatment of them is not probative of whether race motivated its decision to terminate Alexander.

---

believe" that he violated the Forklift Guidelines by failing to report the incidents. *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1003 (8th Cir. 2012) ("If an employer, in explaining a termination, says it believed that the employee violated company rules, then proof that the employee never violated company rules does not show that the employer's explanation was false. That proof shows only that the employer's belief was mistaken. To prove that the employer's explanation was false, the employee must show the employer did not truly believe that the employee violated company rules."). Thus, any dispute over Alexander's knowledge would not preclude summary judgment. *See Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 220 (4th Cir. 2007) (holding that whether the plaintiff actually made physical threats toward his supervisor was "irrelevant" because it was "uncontested that the decisionmaker believed that he did").

Alexander's contention that FedEx offered shifting and inconsistent explanations for his termination is likewise unavailing. *See* ECF No. 42 at 29–30 (arguing that "FedEx's stated reasons for disciplining and terminating Alexander evolved over time" from "alleged safety concerns" to "reporting technicalities"). FedEx disciplined Alexander for one incident in June 2023 and terminated him a month later for entirely separate conduct. [ECF Nos. 34-8 at 2; 34-9 at 2.] Alexander identifies no evidence that FedEx's stated reason for the termination itself—i.e., his failure to report the forklift incidents—ever changed.

Finally, Alexander argues that evidence that other employees have complained of discrimination by Fleig could lead a jury to infer that his termination was racially motivated. [ECF No. 60 at 16.] Specifically, he points to (1) a Title VII lawsuit brought by coworker Vernon Stovall, who similarly claimed that Fleig terminated him because of his race and in retaliation for his prior complaints of discrimination, and (2) an internal complaint by Theodore Tyler, who mentioned in passing that Fleig treated another driver, Lovis Cooper, less favorably because Cooper is Black. [ECF Nos. 42-7, 42-8.] But the mere fact that other employees have alleged discrimination by the same supervisor does not, without more, support the inference that race motivated Alexander's discharge. And in any event, neither set of allegations has been substantiated: Stovall's claims were recently dismissed on summary judgment, Order, *Stovall v. FedEx Freight, Inc.*, No. 3:24-cv-05484-MGL (D.S.C. Sept. 1, 2026), ECF No. 55, while an investigation found no support for the allegations concerning Cooper, ECF No. 42-8 at 6.

In sum, none of Alexander's cited evidence, standing alone or taken together, is sufficient to raise a genuine dispute of material fact on whether race played a role in FedEx's decision to terminate Alexander's employment.

**C. Alexander Cannot Establish a Prima Facie Case of Retaliation**

Alexander also objects to the magistrate judge's recommendation to grant summary judgment on his retaliation claim. The magistrate judge concluded that Alexander failed to make out a prima facie case of retaliation because he had not presented any record evidence showing that he engaged in protected activity. [ECF No. 56 at 17.] In his objections to the Report, Alexander points for the first time to his answers to FedEx's interrogatories, in which he stated that after he received his three-day suspension, he "opposed it as disparate treatment based on race in the workplace." [ECF No. 42-4 at 4, 6, 7; ECF No. 60 at 14.] He contends that informal complaints to management can qualify as protected activity and that a party may properly rely on interrogatory answers to oppose summary judgment. [ECF No. 60 at 14.]

Alexander is correct that employees engage in protected activity when they "complain to their superiors about suspected violations of Title VII." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (internal quotation marks omitted). He is also correct that the Federal Rules contemplate the use of interrogatory answers at summary judgment. Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including . . . interrogatory answers . . . ."). But answers to interrogatories must be made "in writing under oath" and signed by "[t]he person who makes . . . them." Fed. R. Civ. P. 33(b)(3), (b)(5). The excerpt of Alexander's responses to FedEx's interrogatories in the record does not contain his signature or any attestation. As a result, it is not competent summary-judgment evidence and cannot be used to oppose FedEx's motion. *See Wood v. Credit One Bank*, 277 F. Supp. 3d 821, 832 (E.D. Va. 2017) ("[U]nsworn, unsigned answers to interrogatories do not meet the requirements of F[ederal] R[ule of] Civ[il] P[rocedure 56(c)(4)]." (quoting *Roberts v. Gen. Elec. Co.*, 1 F.3d 1234, 1993 WL 303308, at *1

n.3 (4th Cir. Aug. 9, 1993) (unpublished but orally argued table decision))); *Kincaid v. Anderson*, 681 F. App'x 178, 181 (4th Cir. 2017) (holding that the district court "did not abuse its discretion" in refusing to consider the plaintiff's interrogatory answers at summary judgment when the answers "were not properly attested").

Even if the court were to consider Alexander's unsigned and unsworn interrogatory answers, and even assuming they were sufficient to show that he engaged in protected activity, his retaliation claim would still fail. "Fourth Circuit precedent addressing the causation prong of a prima facie case of retaliation requires that a plaintiff demonstrate that the decisionmaker imposing the adverse action have actual knowledge of the protected activity." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 125 (4th Cir. 2021); *see also Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998). Here, Alexander states that he "opposed" his suspension "as disparate treatment based on race," but he does not say to whom he voiced that opposition or when. Fleig, for his part, testified that he was unaware of any complaint Alexander made. [ECF No. 34-6 at 12, 18.] Nothing in the record contradicts that testimony, and Alexander cites no evidence that Fleig or anyone else involved in his termination actually knew about his complaint of discrimination. Without such evidence, Alexander cannot create a genuine dispute for trial on the causation element of his prima facie case. *See Roberts*, 998 F.3d at 124 ("Where a relevant decisionmaker is unaware of any prior complaints, a plaintiff cannot establish the necessary causal connection between his filing a complaint and his termination." (citation modified)).

## IV. CONCLUSION

After reviewing the objected-to portions of the Report de novo and the remainder for clear error, the court **OVERRULES** Alexander's objections, ECF No. 60, **ADOPTS** the Report, ECF

No. 56, and **GRANTS** FedEx's motion for summary judgment, ECF No. 34. The clerk shall enter judgment and close the case.

**IT IS SO ORDERED.**

September 30, 2026
Columbia, South Carolina

Sherri A. Lydon
Sherri A. Lydon
United States District Judge